Citation Nr: 1331575 
Decision Date: 09/30/13 Archive Date: 10/02/13

DOCKET NO. 05-07 174 ) DATE
 )
 )


On appeal from the
Department of Veterans Affairs Regional Office in Columbia, South Carolina


THE ISSUE

Entitlement to a total disability rating based on individual unemployability due to service-connected disabilities (TDIU).


REPRESENTATION

The Veteran represented by: The American Legion


ATTORNEY FOR THE BOARD

S. Mishalanie, Counsel


INTRODUCTION

The Veteran served on active duty from October 1979 to September 1983 and from June 1986 to June 2002. 

This matter initially came before the Board of Veterans' Appeals (Board) on appeal from a May 2004 rating decision issued by the Department of Veterans Affairs (VA) Regional Office (RO) in Columbia, South Carolina. 

The Board remanded the claim in September 2009, April 2011, and July 2013 for additional development. The claim has been returned to the Board for further appellate action.

The Board has reviewed the Veteran's claims file and the record maintained in the Virtual VA paperless claims processing system. 

As noted by the Board in July 2013, the issue of entitlement to service connection for chronic obstructive pulmonary disease (COPD) has been raised by the Veteran's representative in a May 2012 statement, but has not been adjudicated by the Agency of Original Jurisdiction (AOJ). Therefore, the Board does not have jurisdiction over it, and it is referred to the AOJ for appropriate action. 


FINDINGS OF FACT

1. The Veteran does not have one service-connected disability rated at 60 percent or more or multiple service-connected disabilities of which one was rated at 40 percent or more, with a combined rating of at least 70 percent for service-connected disabilities.

2. The Veteran's service-connected disabilities do not render her unable to secure or follow a substantially gainful occupation consistent with her education and industrial background.


CONCLUSION OF LAW

The criteria for a TDIU have not been met. 38 U.S.C.A. § 1155, 5107 (West 2002); 38 C.F.R. §§ 3.321, 3.340, 3.341, 4.16 (2013).


REASONS AND BASES FOR FINDINGS AND CONCLUSION

Duties to Notify and Assist

The Veterans Claims Assistance Act (VCAA) defines VA's duty to assist the Veteran in the development of a claim. VA regulations for the implementation of the VCAA were codified as amended at 38 C.F.R. §§ 3.102, 3.156(a), 3.159, and 3.326(a) (2013).

The notice requirements of the VCAA require VA to notify a Veteran of what information or evidence is necessary to substantiate the claim; what subset of the necessary information or evidence, if any, the claimant is to provide; and what subset of the necessary information or evidence, if any, VA will attempt to obtain. 38 C.F.R. § 3.159(b). The requirements apply to all five elements of a service connection claim: Veteran status, existence of a disability, a connection between a Veteran's service and the disability, degree of disability, and effective date of the disability. Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). VCAA notice must be provided to a claimant before the initial unfavorable decision on a claim for VA benefits by the AOJ (in this case, the RO). Id.; see Pelegrini v. Principi, 18 Vet. App. 112 (2004). However, insufficiency in the timing or content of VCAA notice is harmless if the errors are not prejudicial to the claimant. Conway v. Principi, 353 F.3d 1369, 1374 (Fed. Cir. 2004) (VCAA notice errors are reviewed under a prejudicial error rule).

In this case, in a March 2004 letter issued prior to the rating decision on appeal, VA provided notice to the Veteran regarding what information and evidence is needed to substantiate a claim for TDIU, to include what information and evidence must be submitted by the Veteran and what information and evidence will be obtained by VA. The RO did not provide notice as to how effective dates are assigned in accordance with Dingess; however, because the claim is being denied and no effective date is being assigned, the Veteran is not prejudiced by the absence of this notice. 

The record also reflects that VA has made reasonable efforts to obtain relevant records adequately identified by the Veteran. Specifically, the information and evidence that have been associated with the claims file includes VA and private treatment records, statements from the Veteran and her representative, and VA examination reports.

In September 2009, the Board, in part, remanded the matter to schedule the Veteran for another VA examination to assess the current severity of her service-connected depression and anxiety. The Board directed the assigned examiner to render an opinion as to whether the Veteran's psychiatric disorders rendered it impossible for her to follow substantially gainful occupation. An examination was scheduled in June 2010. Prior to the examination, in February 2010 and May 2010, the Veteran was sent a letter regarding the consequences of failing to report for the examination. Nonetheless, the Veteran failed to report for the examination. The Veteran was also sent a letter in June 2010, following the scheduled examination, asking if she had good cause for failing to report to the examination. The Veteran did not respond to the letters, and has not provided good cause for her absence. 38 C.F.R. § 3.655(b) (2013). The Board finds that the Veteran was given proper due process for providing evidence of good cause for her failure to report for the examination, to include requesting that a new examination be scheduled. For example, in the June 2010 letter, the RO informed the Veteran that if she had a valid reason for missing the examination or if she wanted to have her examination rescheduled, she should contact VA within 10 days. This letter was sent to the same address shown on an April 2010 report of contact, which means it was sent to the Veteran's last known address. In December 2010, the RO found out that the VA Medical Center had a different address for the Veteran. "Same street as before but a different city. Phone number is also different." The employee further noted that the Veteran had changed her last name. Thus, the employee asked that the Veteran be contacted to see if she wanted to appear for a VA examination. This letter was sent to the Veteran in December 2010. No response was received. In January 2011, VA attempted to contact the Veteran by phone, and there was no answer. The RO sent the Veteran a supplemental statement of the case in January 2011, which laid out her failure to report for the VA examination and its attempts to contact her regarding this failure. There is no indication in the file that any of these letters sent to the Veteran were returned as undeliverable. Thus, she is presumed to have received them.

The Board is satisfied as to substantial compliance with its September 2009, April 2011, and July 2013 remand directives. See Dyment v. West, 13 Vet. App. 141, 146-47 (1999); Stegall v. West, 11 Vet. App. 268 (1998). The remands included scheduling the Veteran for another VA examination for her menorrhagia with anemia, which she had in June 2010. As noted above, she failed to report to her June 2010 VA psychiatric examination and did not provide good cause for her failure in this regard. The remands also included obtaining the Veteran's recent VA and private records, which were obtained and associated with the claims file. Finally, the remands included sending the Veteran VCAA notice letters in November 2009 and May 2011, allowing her an opportunity to submit additional medical or other evidence in response (which she did), and then readjudicating her claims in the January 2011 and March 2012 Supplemental Statements of the Case (SSOCs). The July 2013 remand included effectuating the Board's decision regarding her disability evaluations for depression and menorrhagia and reconsidering her claim for a TDIU, which was done in an August 2013 SSOC. Thus, there has been substantial compliance with the Board's prior remand directives, and no further remand to satisfy the duty to notify and assist is necessary. See Dyment, 13 Vet. App. at 146-47; Stegall, 11 Vet. App. at 268. 

For the reasons set forth above, the Board finds that VA has complied with the VCAA's notification and assistance requirements. The claim for entitlement to a TDIU is thus ready to be considered on the merits. 

Analysis

Total disability ratings for compensation based on individual unemployability may be assigned where the schedular rating is less than total if it is found that the disabled person is unable to secure or follow a substantially gainful occupation as a result of (1) a single service-connected disability ratable at 60 percent or more, or (2) as a result of two or more disabilities, provided at least one disability is ratable at 40 percent or more, and there is sufficient additional service-connected disability to bring the combined rating to 70 percent or more. See 38 C.F.R. §§ 3.340, 3.34l, 4.16(a) (2013). Where these percentage requirements are not met, entitlement to the benefits on an extraschedular basis may be considered when the Veteran is unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities. See 38 C.F.R. §§ 3.321(b), 4.16(b).

Entitlement to a TDIU requires the presence of impairment so severe that it is impossible for the average person to follow a substantially gainful occupation. See 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 3.340, 3.341, 4.16. In reaching such a determination, the central inquiry is "whether the Veteran's service-connected disabilities alone are of sufficient severity to produce unemployability." Hatlestad v. Brown, 5 Vet. App. 524, 529 (1993). Consideration may be given to the Veteran's level of education, special training, and previous work experience in arriving at a conclusion, but not to her age or the impairment caused by non-service-connected disabilities. See 38 C.F.R. §§ 3.341, 4.16, 4.19 (2013).

In this case, service connection is in effect for a depression and anxiety (also diagnosed as posttraumatic stress disorder (PTSD)), which has been evaluated as 50 percent disabling from July 1, 2002 and 30 percent disabling from December 16, 2004. Service connection is also in effect for menorrhagia with anemia, which has been evaluated as 0 percent disabling from July 1, 2002, 10 percent disabling from September 24, 2004, and 0 percent disabling from March 25, 2008. She has a combined evaluation of 50 percent from July 1, 2002, 60 percent from September 24, 2004, 40 percent from December 16, 2004, and 30 percent from March 25, 2008. Accordingly, because the Veteran does not have a single service-connected disability rated at 60 percent or more, or a combined disability rating of 70 percent or more, the Veteran does not meet the percentage requirements for a TDIU under 38 C.F.R. § 4.16(a).

Nevertheless, a TDIU may still be available if the Veteran is unable to secure and follow a substantially gainful occupation by reason of her service-connected disability. 38 C.F.R. § 4.16(b). As such, pursuant to 38 C.F.R. § 4.16(b), consideration must be given as to whether the Veteran is entitled to a TDIU on an extraschedular basis.

The Board notes that entitlement to a TDIU extra-schedular rating under 38 C.F.R. § 4.16(b), and an extra-schedular rating under 38 C.F.R. § 3.321(b)(1) , although similar, are based on different factors. See Kellar v. Brown, 6 Vet. App. 157 (1994). An extra-schedular rating under 38 C.F.R. § 3.321(b)(1) is based on the fact that the schedular ratings are inadequate to compensate for the average impairment of earning capacity due to the Veteran's disabilities. Exceptional or unusual circumstances, such as frequent hospitalization or marked interference with employment, are required. In contrast, 38 C.F.R. § 4.16(b) merely requires a determination that a particular Veteran is rendered unable to secure or follow a substantially gainful occupation by reason of his or her service-connected disabilities. See VAOPGCPREC 6-96. 

In this regard, the Board notes that for a Veteran to prevail on a claim for TDIU on an extraschedular basis, it is necessary that the record reflect some factor which places the case in a different category than other Veterans with an equal rating of disability. See Van Hoose v. Brown, 4 Vet. App. 361, 363 (1993). The pertinent question is whether the Veteran is capable of performing the physical and mental acts required by employment, not whether the Veteran can find employment. Id. This is so because a disability rating in itself is recognition that the impairment makes it difficult to obtain or keep employment. Id. Significantly, however, the Board does not have jurisdiction to authorize an extraschedular rating in the first instance. Floyd v. Brown, 9 Vet. App. 88 (1996); Cf. 66 Fed. Reg. 49, 886 (Oct. 1, 2001) (final rule proposal to authorize the Board to assign an extraschedular rating). It may, however, determine that a particular case warrants referral to the Director of Compensation and Pension for extraschedular consideration pursuant to 38 C.F.R. § 3.321(b) and 38 C.F.R. § 4.16 (b).

In this case, the evidence of record fails to show that the Veteran is unable to secure or follow a substantially gainful occupation as a result of her service-connected disabilities.

In various written statements, the Veteran contends that she is unable to work due to her depression and anxiety, inability to concentrate, confusion, memory loss, and panic attacks. She also has stated that she has weakness from anemia and headaches during menstruation. (See September 2004 Notice of Disagreement, March 2005 substantive appeal (VA Form 9)).

In March 2004, the RO sent the Veteran a letter and requested that she complete and return an enclosed VA Form 21-8940, Veteran's Application for Increased Compensation Based on Unemployability. She failed to respond. Therefore, the Board has only limited information regarding her employment and education history based on reports made in her medical records. A March 2003 VA outpatient treatment record indicates that she was going to night school to complete her GED. During an August 2003 VA examination, she reported that she completed high school and had one and a half years at a junior college. She retired from the military and worked until May 2003 at a computer job. She said she quit that job because she could not sit still and was having problems managing stress. She then took a job delivering pizzas. 

A July 2003 VA vocational rehabilitation consultation note reflects that the Veteran reported that she had 22 years in the military and was unemployed. During service, she indicated that she worked various clerical and administrative duties at different military installations. She said she quit her previous civilian job as an administrative specialist to take a job as a cashier, which she thought would be less stressful. The Veteran noted she had 9 credit hours in college courses, but that the she had yet to see if any of her military correspondence course would transfer into college credit hours. 

The Veteran rated her self-perceived higher-order thinking skills as a 9/10, which included problem solving, learning skills and strategies, creative and innovative thinking, and decision making. She rated her affective skills and personal traits as 10/10, which included dependability and responsibility, positive attitude towards work, conscientiousness, punctuality, efficiency, interpersonal skills, cooperation, working as a team member, self-confidence, positive self-image, adaptability, flexibility, enthusiasm, motivation, self-discipline, self management, appropriate dress, grooming, honesty, integrity, and ability to work without supervision. She rated her oral communication skills as 6/10, her reading and understanding and following instructions as 9/10, basic arithmetic as 3/10, and her writing as 6/10. She said she did not have any industry-specific skills. She indicated that she was only absent from work due to "routine" medical treatment. She also indicated that once she secured employment, she felt she had the ability to maintain employment while handling progressive responsibility, i.e., medical, family, financial, social and other related issues. She did indicate that personal and social issues would affect her employability as she was going through a divorce and had concerns with her children. 

During a March 2004 VA examination, the Veteran reported that she continued to deliver pizzas and said that she could handle this job because of the absence of stress even though it was below her abilities. In a September 2004 statement, she said she was no longer able to deliver pizzas due to lack of concentration, getting confused, getting lost, getting orders mixed up, going to the wrong house, and hitting a mailbox, etc. 

A December 2004 VA outpatient treatment record reflects that the Veteran reported that her husband had died in March 2004. She said when her husband died she had trouble working, but said that she was working a part-time job at a country club and had a job interview for a telemarketing position. 

Subsequent VA outpatient treatment records reflect that the Veteran had ongoing problems with polysubstance abuse and was unemployed. There are notations of malingering and drug-seeking behavior. In May 2010, she reported that she began using heroin in 2006 and was using it daily. She was admitted for detox. 

Regarding the Veteran's service-connected depression and anxiety, the evidence reflects mild to moderate occupational impairment commensurate with her assigned disability evaluations. An August 2003 VA examiner opined that in terms of the Veteran's ability "to maintain employment and perform job duties in a reliable flexible and efficient manner, associated with [psychiatric disability], I would say [she] is probability moderately impaired. Her personality style is also a contributing factor and would make her work adjustment poorer and overall, I would estimate her level of disability to be in the moderate range ..." 

A March 2004 VA examiner noted that the Veteran's husband had died the week before the evaluation and that she was experiencing severe depression. The examiner opined that "prior to the loss of her husband, her psychiatric presentation was resulting in a moderate degree of impairment in adaptation, impairment in flexibility and efficiency in an occupational setting. Overall, her level of disability is moderate."

A June 2004 VA outpatient treatment record reflects that the Veteran was diagnosed with an affective disorder, cyclothymic in nature. A note was made to rule out bipolar disorder. The psychiatrist indicated that the Veteran was "impaired by virtue of her affective symptoms and social phobia and paranoid ideation in strange or public places that she is rendered much more disabled than is apparent and is virtually unemployable for any sustained occupation." 

A May 2008 VA mental health clinic note reflects that the Veteran reported moderate occupational dysfunction from her depression when she was working. She was diagnosed with mild to moderate major depressive disorder; moderate generalized anxiety disorder; moderate social phobia; and mild anxiety disorder. In May 2010, her major depressive disorder was described as moderate. In May 2011, her major depressive disorder was described as mild to moderate. In April 2011, she was reported to have severe depression after her husband's stroke and seizures. 

Although the June 2004 psychiatrist noted that the Veteran was "virtually unemployable," he did not differentiate between the Veteran's service-connected psychiatric symptoms and her nonservice-connected symptoms. Additionally, his opinion is the only one making such an assertion, and the preponderance of the evidence does not support this conclusion. Furthermore, the Board notes that the Veteran's husband had died previously that year and the March 2004 VA examiner described her as being in state of mourning. Thus, her symptoms may have been exacerbated at that time, which her 50 percent evaluation assigned at that time contemplated. See 38 C.F.R. § 4.1 (2013) ("Generally, the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerbations or illness proportionate to the severity of the several grades of disability."). When the Veteran returned for VA treatment in May 2008, her symptoms were described as only moderate. 

As noted above, the Veteran failed to report for the scheduled VA examination in June 2010 to assess the severity of her service-connected psychiatric disability and obtain an opinion regarding employability. When a claimant deliberately fails to cooperate with VA in the development of the medical evidence, VA is entitled to rely on the evidence of record in making its determination. 38 C.F.R. § 3.655(a) (2013). The duty to assist is not a one-way street. See Wood v. Derwinski, 1 Vet. App. 190, 193 (1991). Under VA regulations, it is incumbent upon the Veteran to submit to a VA examination if she is applying for, or in receipt of, VA compensation or pension benefits. See Dusek v. Derwinski, 2 Vet. App. 519 (1992). When necessary or requested, the Veteran must cooperate with the VA in obtaining evidence. Accordingly, the Board will make its decision based upon the evidence of record. 

In this case, the Board finds that the evidence weighs against finding that the Veteran's service connected depression and anxiety render her unable to secure and follow substantially gainful employment. Rather, the evidence reflects mild to moderate occupational impairment commensurate with her disability evaluations. The evidence does not indicate that she is incapable of performing the physical and mental acts required by employment. See Van Hoose, 4 Vet. App. at 363. 

The Board also finds that the Veteran's menorrhagia with anemia, either alone or in concert with her service-connected psychiatric disability, does not render her unable to secure and follow substantially gainful employment. During the August 2003 VA examination, she reported having heavy menstrual periods since 1990. Despite her symptoms, she was able to perform her military duties until she retired in June 2002. During the June 2010 VA examination, she indicated that her menstruation had stopped two years previously. The examiner noted a past diagnosis of menorrhagia with anemia, which had resolved. She opined that the condition had no effects on the Veteran's usual occupation and did not result in work problems. 

Finally, the Board acknowledges the Veteran's contentions that she is unable to work as a result of her service-connected disabilities; however, the Board finds the findings made by the VA examiners discussed in detail above about how her symptoms are, for the most part, moderately disabling, are much more probative in determining whether she is unable to obtain and maintain gainful employment.. 

Based on the foregoing, the Board concludes the evidence weighs against finding that that the Veteran is unable to secure and follow a substantially gainful occupation due to her service-connected disabilities. As such, there is no reason for a referral of the claim to the Director of the VA Compensation and Pension Service for extra-schedular consideration pursuant to 38 C.F.R. § 4.16(b). The evidence in this case is not so evenly balanced so as to allow for application of the benefit of the doubt rule as required by law and VA regulations. See 38 U.S.C.A. §5107 (West 2002); Gilbert v. Derwinski, 1 Vet. App. 49 (1991). Therefore, the Veteran's claim of entitlement to a TDIU must be denied.


ORDER

Entitlement to a TDIU is denied.



_____________________________________________
Alexandra P. Simpson
Acting Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs